**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| YVONNE RIVERA, | ) | |
| | ) | Case No. 20-cv-13374 |
| Plaintiff, | ) | |
| | ) | Hon. Gershwin A. Drain |
| v. | ) | |
| | ) | |
| SYNCHRONY FINANCIAL, a Delaware Corporation; DETROIT TIRE & AUTO SERVICE, INC., a Michigan Corporation; and DETROIT #1 TIRE & AUTO, INC., a Michigan Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

# **PLAINTIFF'S FIRST AMENDED COMPLAINT**

## INTRODUCTION

1. The Fair Credit Billing Act (FCBA) requires creditors to investigate, and where necessary, correct, billing errors reported by consumers. *See* FCBA, 15 U.S.C. §§ 1666-1666j; *Burnstein v. Saks Fifth Ave. & Co.*, 208 F.Supp.2d 765, 772 (E.D. Mich. 2002).

2. In spite of this requirement, Synchrony Financial ("Synchrony") failed to adequately investigate the billing error of which they had been properly notified by Plaintiff Yvonne Rivera.

3. Through no fault of her own, and without her informed assent, Defendants Detroit Tire & Auto Service and Synchrony Financial charged Ms. Rivera's credit

line more than $8,750 for a single repair on a vehicle with a market value of no more than $2,700. These charges were made despite an ostensible credit limit of $4,400.

4. Ms. Rivera, a senior citizen, has experienced substantial stress and emotional damages as a result of Defendants' actions. Ms. Rivera brings this complaint to challenge Defendants' predatory and dishonest business practices. Ms. Rivera seeks damages, attorneys' fees, and costs.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to FCBA, 15 U.S.C. §§ 1666-1666j, because this matter presents a federal question under 28 U.S.C. § 1331.

6. Ms. Rivera requests that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) over her state law claims, as these claims form part of the same case or controversy as her federal claims.

7. This court has personal jurisdiction over Defendant Synchrony Financial, Inc. through Defendant's sustained business in the State of Michigan and its demonstrated intent to serve the market for its product in the State of Michigan. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

8. This Court has personal jurisdiction over Defendant Detroit Tire & Auto Service ("Detroit Tire") because Defendant Detroit Tire is a resident of the State of Michigan, and a substantial portion of the acts or omissions alleged in this Complaint occurred in the State of Michigan.

9. This Court has personal jurisdiction over Defendant Detroit #1 Tire & Auto, Inc. ("Detroit #1 Tire") because Defendant Detroit #1 Tire is a resident of the State of Michigan, and a substantial portion of the acts or omissions alleged in this Complaint occurred in the State of Michigan.

10. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391 because this is the judicial district where Ms. Rivera, Detroit Tire, and Detroit #1 Tire are located and where the transaction and subsequent events giving rise to her claims occurred.

## PARTIES

11. Plaintiff Yvonne Rivera ("Ms. Rivera") is a senior citizen who resides in Wayne County in the State of Michigan.

12. Defendant Synchrony Financial, Inc. ("Synchrony") is a Delaware for-profit financial corporation. Synchrony does substantial business in the State of Michigan and nationwide, including contracting to provide consumer credit card services to businesses, including Defendant Detroit Tire & Auto Service, Inc. ("Detroit Tire") and, upon information and belief, Defendant Detroit #1 Tire & Auto, Inc. ("Detroit #1 Tire"). Defendant Synchrony Financial is a "creditor" as defined by TILA, 15 U.S.C. § 1640.

13. Defendant Detroit Tire & Auto Service ("Detroit Tire") is a Michigan for-profit corporation that provides auto repair services. Detroit Tire & Auto's principal

place of business is 14595 Livernois, Detroit, MI 48238. Defendant Detroit Tire is a "motor vehicle repair facility" as defined by the Michigan Motor Vehicle Service and Repair Act (MVSRA), MICH. COMP. LAWS 257.1302.

14. Defendant Detroit #1 Tire & Auto, Inc. ("Detroit #1 Tire") is a Michigan for-profit corporation that provides auto repair services. Detroit #1 Tire's principal place of business is the same as that of Detroit Tire, 14595 Livernois, Detroit, MI 48238. Defendant Detroit #1 Tire is a "motor vehicle repair facility" as defined by the Michigan Motor Vehicle Service and Repair Act (MVSRA), MICH. COMP. LAWS 257.1302. Despite purportedly dissolving in July 2020, Detroit Tire, upon information and belief, has continued to operate.

15. Defendant Detroit #1 Tire is also liable through corporate successor liability as a "mere continuation" of Defendant Detroit Tire. *See, e.g.*, *Pearce v. Schneider*, 217 N.W. 761, 762 (Mich. 1928) (deeming the new corporation "but a reincarnation of the old" due to their possession of the same stockholders and the same corporate purpose); *Gougeon Bros., Inc. v. Phoenix Resins, Inc.,* 2000 WL 33534582, at *2 (Mich. App. Feb. 8, 2000) (affirming the trial court's imposition of corporate successor liability in part based on the finding that "defendant conducts business at same address" as the prior corporation).

16. Upon information and belief, at all times relevant to this Complaint, Defendant Detroit #1 Tire was Defendant Detroit Tire's alter ego and is liable for all

of Detroit Tire's actions. Upon information and belief, Detroit #1 Tire has always operated under Detroit Tire's name and repair facility license relevant to this Complaint.

## STATEMENT OF FACTS

### Ms. Rivera's Initial Vehicle Issues

17. Ms. Rivera owns a 2004 Dodge Stratus that she purchased new in 2004. Her Dodge Stratus is her sole source of transportation that she uses to complete errands, attend doctor's appointments and to visit family.

18. On or around October 7, 2019, Ms. Rivera took her vehicle to Detroit Tire for repairs. She had previously taken her vehicle to another mechanic, who had informed her that her vehicle was leaking oil and transmission fluid.

19. Ms. Rivera informed Detroit Tire that she only wanted her transmission repaired.

20. Jamal, the representative at Detroit Tire, verbally provided Ms. Rivera with a quote that the repair would cost approximately $2,000.

21. Ms. Rivera informed Jamal that she would be unable to afford that price. In response, he encouraged Ms. Rivera to apply for financing with Synchrony Financial.

22. During this visit, Ms. Rivera authorized Detroit Tire to repair her transmission based on Detroit Tire's estimate.

## Credit Application

23. Detroit Tire's representative called Synchrony Financial on Ms. Rivera's behalf to complete the credit application.

24. To apply for the financing, Detroit Tire's representative asked Ms. Rivera to dictate her contact information, social security number (SSN), employment status, income, and other information.

25. At no point during this visit was Ms. Rivera provided with any documents to sign. Nor did Ms. Rivera sign any documentation regarding the credit card.

26. Ms. Rivera was not provided any documentation regarding the terms of her credit card nor was she provided an opportunity to review her application.

27. After the credit application had been completed, Ms. Rivera left the vehicle at Detroit Tire for them to repair the vehicle.

## Communications with Synchrony Financial

28. On or around October 13, 2019, Ms. Rivera received a statement from Synchrony Bank with a balance of $2,985.00 and a reference to a transaction with Detroit Tire. This was the first time Ms. Rivera had seen this figure, or a specific dollar amount related to her car repair. *See* Exhibit 1, 10.13.2019 Synchrony Financial Billing Statement.

29. The statement also indicated that her credit limit was $4,400. *Id.*

30. The following week, on or about October 15, 2019, Ms. Rivera received a notice that her request for a credit line was denied. *See* Exhibit 2, 10.15.2019 First Synchrony Financial Credit Increase Rejection.

31. Ms. Rivera was quite surprised, as she had never applied for a credit line increase. In fact, she had just applied for her first credit line.

32. On October 24, 2019, Ms. Rivera received an another, similar notice from Synchrony Financial. *See* Exhibit 3, 10.24.2019 Second Synchrony Financial Credit Increase Rejection.

**Additional Repairs**

33. Several days passed in which Ms. Rivera did not receive any contact from Detroit Tire regarding her vehicle. In fact, it was only after she called to inquire about the status of her car that she learned that Detroit Tire had identified several additional repairs to the vehicle.

34. At no point during the call did Detroit Tire inform her of the cost of the repairs or obtain her authorization to make the repairs.

35. Nor did Detroit Tire provide Ms. Rivera with an estimate regarding the cost of her repairs.

36. After more days with no contact from Detroit Tire, on October 24, 2019, Ms. Rivera went in person to Detroit Tire to check on the status of her vehicle.

37. When Ms. Rivera arrived and inquired about the status of her vehicle, she was initially informed that her vehicle was not there; Detroit Tire was apparently under the impression that she had already come to retrieve the vehicle.

38. After the employees of Detroit Tire eventually located her vehicle, Detroit Tire presented her with an invoice for $8,900.00 for a host of repairs and part replacements including:

i. A used transmission assembly
ii. A radiator
iii. Front struts
iv. Rear struts
v. All-season Pro Meter
vi. Upper control arms
vii. CV axles
viii. Rear drums
ix. Rear bearings

Exhibit 4, 10.24.2019 Detroit Tire Invoice.

39. The repair invoice indicated that the repairs were financed through her credit line with Synchrony Financial. *Id.*

40. Ms. Rivera was shocked to see that Detroit Tire had completed nearly $7,000 worth of additional repairs to her vehicle when all she had requested was that her transmission be repaired.

41. Ms. Rivera was also provided a document from Detroit Tire stating that her card was charged $4,500. *See* Exhibit 5, 10.24.2019 Synchrony Financial Billing Statement.

42. When Ms. Rivera questioned the repairs, she was informed that Jamal, the mechanic who she had dealt with in the prior interaction, had been fired for malfeasance.

43. When Ms. Rivera requested her vehicle, she was told that she could only have her vehicle back if she signed the estimate and the documents associated with Synchrony Financial.

44. Needing her vehicle and under duress, Ms. Rivera reluctantly signed the documentation.

45. The following month, Ms. Rivera received another statement from Synchrony with a balance of $8,778 and a monthly payment of $439 due on December 5, 2019. *See* Exhibit 6, 11.12.2019 Synchrony Financial Billing Statement.

46. Ms. Rivera was also shocked to learn that her credit card – which had a limit of $4,400 – had been charged nearly $9,000.

47. Ms. Rivera was even more surprised that $9,000 worth of repairs had been completed on the vehicle, as the vehicle was only worth about $2,000.

48. Weeks after retrieving her vehicle from Detroit Tire and continuing to experience issues with the vehicle, Ms. Rivera took her vehicle to another mechanic – Imperial Auto.

49. The mechanics at Imperial Auto informed Ms. Rivera that her transmission was still leaking and that the exhaust to the car was broken. *See* Exhibit 7, 01.03.2020 Imperial Auto Invoice. In fact, she was informed that the control arm had not been replaced, but merely painted over.

**Billing Dispute Communications with Synchrony Financial**

50. In response to the November billing statement, on or about December 4, 2019, Ms. Rivera sent a letter to Synchrony Financial disputing the $8,778 charge, asserting that she did not authorize the repair or receive any written estimate of costs prior to their work, as well as asking Synchrony Financial to investigate the charges. *See* Exhibit 8, 12.04.2019 Plaintiff's Letter to Synchrony Financial.

51. Synchrony Financial confirmed receipt of her dispute letter on December 16, 2019, and informed her that they would investigate the dispute, which could take between one and two billing cycles. *See* Exhibit 9, 12.16.2019 Synchrony Customer Service Letter.

52. Synchrony Financial, in a letter dated February 3, 2020, resolved the billing dispute in Detroit Tire's favor, purporting to have investigated the disputed charges. In support of its resolution, Synchrony Financial attached several documents to the letter; one of which cites three separate transactions, on October 12, October 15, and October 24 of $2,985, $1,415, and $4,500 respectively. *See* Exhibit 10, 02.03.2020 Synchrony Billing Dispute Resolution Letter.

53. The letter further includes documents provided by Detroit #1 Tire purporting to show Ms. Rivera's signature on invoices dated October 12, 2019 and October 15, 2019. *Id.*

54. The signatures on these documents misspell Ms. Rivera's first name "Yvone", instead of "Yvonne". Ms. Rivera has no knowledge of these invoices and was not physically present at Detroit Tire's location to have possibly signed any such invoice on either date. *Id*.

**Detroit Tire's and Detroit #1 Tire's Corporate Relationship**

55. Upon information and belief, Detroit #1 Tire purchased and continues to operate Detroit Tire.

56. Detroit #1 Tire is located at the same location of Detroit Tire – 14595 Livernois Ave., Detroit, MI 42838.

57. Upon information and belief, Detroit #1 Tire is an auto repair shop that repairs and services motor vehicles and provides the same services as Detroit Tire.

58. Upon information and belief, Detroit #1 Tire retained many of Detroit Tire's employees.

59. Upon information and belief, the real property associated with Detroit Tire – 14595 Livernois Ave., Detroit, MI 42838 – was sold by its previous owner and registered agent, Anthony Virga, via Mr. Virga's investment company, to 14595 Livernois LLC in June 2018.

60. According to the State of Michigan, Detroit Tire was dissolved in July 2020. At no point between June 2018 and July 2020, however, was the corporate information updated to reflect new ownership or to identify a new resident agent.

61. According to the filings with the State of Michigan, 14595 Livernois LLC states that it is an investment company and its resident agent is Mohamed Al Lahham. Upon information and belief, Mr. Lahham is the sole owner and operator of 14595 Livernois LLC and purchased the property to operate Detroit Tire and Detroit #1 Tire.

62. Detroit #1 Tire was incorporated in May 2018 by Mohamed Al Lahham. Its resident agent is Ms. Lahham and its resident agent address is 14595 Livernois.

63. Upon information and belief, Mr. Lahham also owns and operates Detroit #1 Tire and Auto Inc at the same address as Detroit Tire, 14595 Livernois Ave.

64. According to the State of Michigan, Defendant Detroit #1 Tire was incorporated at 14595 Livernois Ave on May 14, 2018, prior to the June 14, 2018

sale of the property at the address 14595 Livernois Ave to 14595 Livernois LLC and over two years before Defendant Detroit Tire is purported to have dissolved.

65. Despite purportedly dissolving in July 2020, Detroit Tire obtained a new license from the State of Michigan Secretary of State to operate as a repair facility in July 2020 (License Number F168403).

66. Upon information and belief, Detroit #1 Tire does not have a separate license to operate as a repair facility.

67. Upon information and belief, Detroit #1 Tire has been operating under Detroit Tire's repair facility license since it incorporated.

68. Upon information and belief, and according to both businesses' information on file with the Michigan Department of Licensing and Regulatory Affairs and Secretary of State, beginning in May 2018, both Detroit Tire and Detroit #1 Tire operated as a single auto repair business located at 14595 Livernois Ave, Detroit MI 48238.

69. Despite Detroit Tire's purported dissolution, upon information and belief, it is still operating and engaging in the business of providing vehicle repairs.

70. Upon information and belief, Detroit Tire and Detroit Tire #1 are operating as the same entity to provide vehicle repairs.

71. As such, Detroit #1 Tire is liable for all actions taken by Detroit Tire as its alter ego and as its corporate successor.

## COUNT I – VIOLATION OF FAIR CREDIT BILLING ACT (FCBA) 15 U.S.C. §§ 1666-1666j (Defendant Synchrony Financial)

72. Ms. Rivera re-alleges and incorporates by reference all preceding paragraphs.

73. Ms. Rivera is a consumer, as defined by TILA. *See* 15 U.S.C. § 1602(i) ("The adjective 'consumer,' used with reference to a credit transaction characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."). Ms. Rivera is a natural person and the subject of the parties' transaction was primarily for personal, family, or household purposes.

74. Defendant Synchrony is a creditor, as defined by TILA. *See* 15 U.S.C. § 1602(g).

75. On or about December 4, 2020, Ms. Rivera first notified Synchrony, in writing, of a dispute with the amount that she was alleged to have owed on the account. *See* Exhibit 8, 12.04.2020 Plaintiff's Letter to Synchrony Financial, December 4, 2019.

76. Synchrony responded on or about December 16, 2019 with a letter informing Ms. Rivera that Synchrony was investigating the billing dispute. *See* Exhibit 9, 12.16.2019 Synchrony Customer Service Letter, December 16, 2019.

77. On or about January 8, 2020, Synchrony sent another letter to Ms. Rivera, purporting to confirm that her balance was $8,858, despite a $4,400 credit limit on the account. At no point did Synchrony indicate that it would be reporting her trade line as "disputed," as required under the FCBA, 15 U.S.C. § 1666a. *See* Exhibit 11, 01.08.2020 Synchrony Credit Bureau Specialist Letter, January 8, 2020.

78. Subsequently, on or about January 13, 2020, Ms. Rivera received another letter from Synchrony's customer service department, informing her that Synchrony would investigate her dispute, that investigation of the dispute could take up to 60 days, and that upon completion of the investigation, Synchrony would notify Ms. Rivera by mail or email of the result of the investigation, and would "include the reason(s) and supporting documentation where needed." Exhibit 12, 01.12.2020 Synchrony Customer Service Letter.

79. Finally, on or about February 3, 2020, Synchrony Financial sent Ms. Rivera a letter informing her that they had finished investigating her billing dispute, and that they had determined, by speaking with the merchant, Detroit Tire, that no billing error had occurred. *See* Exhibit 10, 02.03.2020 Synchrony Financial Billing Dispute Resolution Letter.

80. Upon receiving notice of an alleged billing error from a consumer, a creditor has 90 days to "either correct the billing error and inform the consumer of this correction, or provide written notice and explanation that, upon reasonable

investigation, the creditor has determined that no billing error occurred." *Burnstein v. Saks Fifth Ave. & Co.*, 208 F.Supp.2d at 772-73.

81. Synchrony's inquiry to Detroit Tire, and their proffered justification for concluding that no billing error had occurred do not constitute a reasonable investigation of the billing dispute as required by 15 U.S.C. § 1666(a)(B).

82. Any substantive investigation of Ms. Rivera's claims would have uncovered that she was not, in fact, physically present at the facility on either October 12 or October 15, 2019, contradicting Detroit #1 Tire's general assertions about her assent to the transactions, as well as casting substantial doubt on the veracity of the signatures on the invoices from those dates.

83. Indeed, Detroit #1 Tire's own proffered explanation of the sequence of events only alleges that Ms. Rivera came in for service on October 10, 2019. Detroit #1 Tire does not mention any repeat visits aside from the October 24 visit in which she retrieved her vehicle. *See* Exhibit 10, 02.03.2020 Synchrony Billing Dispute Resolution Letter.

84. Detroit Tire does not provide a copy of the referenced written estimate, despite being required to maintain a copy of the estimate for three years.

85. Nor did Synchrony investigate Ms. Rivera's claim that Detroit Tire did not in fact repair her transmission or failed to properly repair her vehicle. There is

nothing in Synchrony's resolution of her claim that addresses the quality of the service and goods provided by Detroit Tire.

86. At no point in time did Synchrony request additional information from Ms. Rivera beyond her initial letter.

87. Indeed, if Synchrony had conducted a reasonable investigation, it would have discovered that Ms. Rivera did not authorize the charges to her card and that Detroit Tire did not properly repair her vehicle.

88. Synchrony's failure to reasonably investigate Ms. Rivera's claims of a billing error constitutes a violation of the Fair Credit Billing Act. 15 U.S.C. §§ 1666-1666j.

89. Because Defendant Synchrony Financial has violated the Fair Credit Billing Act, Ms. Rivera is entitled to actual damages, statutory damages, and reasonable attorneys' fees. *See* 15 U.S.C. § 1640.

## COUNT II – VIOLATION OF MICHIGAN MOTOR VEHICLE SERVICE AND REPAIR ACT, MICH. COMP. LAWS 257.1307a (ALL DEFENDANTS)

90. Ms. Rivera re-alleges and incorporates by reference all preceding paragraphs.

91. Ms. Rivera is a "customer" as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(i) ("'Customer' means the owner or operator of a motor vehicle").

92. Detroit Tire is a motor vehicle repair facility, as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(m).

93. Detroit #1 Tire is also a motor vehicle repair facility, as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(m).

94. MICH. COMP. LAWS 257.1307a prohibits motor vehicle repair facilities from, among other conduct, "[charging] for repairs that are not performed" and from "[performing] and [charging] for repairs that are not specifically authorized."

95. A motor vehicle repair facility is also prohibited from entering into a "contract with a customer that has gross discrepancies between the oral representations of the facility and the written agreement covering the same transaction" or from allowing a "customer to sign an acknowledgment, certificate, or other writing that affirms acceptance, delivery, compliance with a requirement of law, or other performance, if the facility knows or has reason to know that the statement is not true." MICH. COMP. LAWS 257.1307(c), (g).

96. Despite Detroit Tire's claim that they repaired and replaced the transmission, Ms. Rivera continued to report issues with the transmission following the repair.

97. When Ms. Rivera took her vehicle to a different repair shop in December of 2019, they reported that the transmission was leaking fluid, the same issue that mechanics had identified before Ms. Rivera even took her vehicle to Detroit Tire in October. *See* Exhibit 7, 01.03.2020 Imperial Auto Invoice.

98. Furthermore, several of the repairs performed and cited in Detroit Tire's final invoice were not expressly authorized by Ms. Rivera. Indeed, the apparent forgery of Ms. Rivera's signature on the invoices dated October 12, 2019 and October 15, 2019 indicates Detroit Tire's knowledge that Ms. Rivera did not assent to the repairs they were authorizing.

99. As noted above, Ms. Rivera was not physically at Detroit Tire on October 12 or October 15. Nor did she authorize anyone to sign on her behalf.

100. Detroit Tire's violations of the Motor Vehicle Service and Repair Act have caused Ms. Rivera significant stress in addition to being saddled with an unauthorized credit card bill that she cannot afford to pay, and damage to her credit.

101. As the card issuer, Synchrony is also subject to all claims arising out of Ms. Rivera's vehicle repair, as the card was used as a method of payment or extension of credit. *See* 15 U.S.C. § 1666i.

102. As a result of Detroit Tire's violations of the Motor Vehicle Service and Repair Act, Ms. Rivera is entitled to damages and attorneys' fees. MICH. COMP. LAWS 257.1336.

103. If the Court finds that Detroit Tire's violations of the Michigan Motor Vehicle Service and Repair Act were willful and flagrant, Ms. Rivera requests double damages, as authorized by the statute. *Id.*

104. As a mere continuation and alter ego of Defendant Detroit Tire, Defendant Detroit #1 Tire is also liable through corporate successor liability. *See Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 890 N.W.2d 395, 401 (2016) (holding that the mere continuation exception to successor nonliability remains a viable theory of successor liability in Michigan).

**COUNT III – VIOLATION OF MICHIGAN MOTOR VEHICLE SERVICE AND REPAIR ACT MICH. COMP. LAWS 257.1307e (ALL DEFENDANTS)**

105. Ms. Rivera re-alleges and incorporates by reference all preceding paragraphs.

106. Ms. Rivera is a "customer" as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(i) ("'Customer' means the owner or operator of a motor vehicle").

107. Detroit Tire, Inc. is a motor vehicle repair facility, as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(m).

108. Detroit #1 Tire is also a motor vehicle repair facility, as defined by the Motor Vehicle Service and Repair Act. MICH. COMP. LAWS 257.1302(m).

109. The Michigan Motor Vehicle Service and Repair Act requires that repair facilities provide customers with written estimates before beginning work on a motor vehicle. MICH. COMP. LAWS 257.1307e(a).

110. The Act further defines an "estimate" as "a written statement that itemizes as closely as possible the price for labor, by showing the labor price per hour, the number of hours required to perform the work, and the price of parts necessary for a specific repair." MICH. COMP. LAWS 257.1302(l).

111. On her initial visit on or about October 7, 2019 Ms. Rivera was not provided a written estimate before work began on her vehicle; indeed, it was not until October 24, when she picked up her vehicle, that she received any sort of written representation of the costs of the repairs.

112. In Defendant Synchrony Financial's February 3, 2020 letter to Ms. Rivera ostensibly resolving the billing dispute, Defendant attaches, and relies upon an estimate dated October 7, 2019 which appears to bear the signature of Ms. Rivera. This estimate does not provide any price for the services identified, and the dollar value reads "$0.00" in the section titled "Total". Exhibit 10, 02.03.2020 Synchrony Financial Billing Dispute Resolution Letter at 8.

113. Such a document, with no quoted price, does not constitute a written estimate of the costs of the repair as required by MICH. COMP. LAWS 257.1307e(a).

114. In addition, by requiring Ms. Rivera to sign the invoice on October 24, 2019 to obtain her vehicle, Detroit Tire knowingly allowed Ms. Rivera to sign an acknowledgement of compliance with a requirement of the law, when it had reason to know that the statement was not true.

115. Defendant Detroit Tire has violated the Motor Vehicle Service and Repair Act's requirement of a written estimate before beginning work on her vehicle.

116. As a result of Detroit Tire's violations of the Motor Vehicle Service and Repair Act, Ms. Rivera incurred unauthorized charges to her credit card and received repairs that she did not want or need. Detroit Tire's actions have also caused Ms. Rivera significant stress.

117. As the card issuer, Synchrony is also subject to all claims arising out of Ms. Rivera's vehicle repair, as the card was used as a method of payment or extension of credit. *See* 15 U.S.C. § 1666i.

118. Ms. Rivera is entitled to damages and attorneys' fees. MICH. COMP. LAWS 257.1336.

119. If the Court finds that Detroit Tire's violations of the Michigan Motor Vehicle Service and Repair Act were willful and flagrant, Ms. Rivera requests double damages, as authorized by the statute. *Id*.

120. As a mere continuation and alter ego of Defendant Detroit Tire, Defendant Detroit #1 Tire is also liable through corporate successor liability. *See Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 890 N.W.2d at 401 (holding that the mere continuation exception to successor nonliability remains a viable theory of successor liability in Michigan).

**COUNT IV – VIOLATION OF MICHIGAN CREDIT SERVICES PROTECTION ACT MICH. COMP. LAWS 445.1823 (ALL DEFENDANTS)**

121. Ms. Rivera re-alleges and incorporates by reference all preceding paragraphs.

122. Detroit Tire is a "Credit Services Organization" as outlined by the Michigan Credit Services Protection Act, MICH. COMP. LAWS 445.1822(b). Detroit Tire, in return for consideration, assisted Ms. Rivera in the "obtainment of an extension of credit" and provided "assistance regarding the obtainment of an extension of credit."

123. The Michigan Credit Services Protection Act prohibits a credit service organization from engaging in the following activities:

> (b) Charge a buyer or receive from a buyer money or other valuable consideration before completing performance of all services the credit services organization has agreed to perform for the buyer.
>
> (c) Charge a buyer or receive from a buyer money or other valuable consideration solely for referral to a retail seller who will or may extend credit to the buyer if the credit that is or may be extended to the buyer is substantially the same as that available to the general public.
>
> (d) Make or use a false or misleading representation in the offer or sale of the services of a credit services organization.
>
> (e) Engage, directly or indirectly, in a fraudulent or deceptive act, practice, or course of business in connection with the offer or sale of the services of a credit services organization…

***

> (f) Fail to perform the agreed services within 90 days following the date the buyer signs the contract for services.

MICH. COMP. LAWS 445.1823.

124. After securing Ms. Rivera financing through Synchrony, Detroit Tire charged Ms. Rivera for additional repairs that it did not adequately perform and that Ms. Rivera did not authorize. If Ms. Rivera had not secured financing, Detroit Tire would have only charged Ms. Rivera for the transmission repair.

125. Upon information and belief, a Detroit Tire representative requested two increases to Ms. Rivera's credit line for additional repairs. And, despite being denied twice, Detroit Tire charged nearly $9,000.00 to Ms. Rivera's card with Synchrony.

126. Detroit Tire misrepresented the repairs it would make to Ms. Rivera's vehicle, the cost of those repairs, and the cost of Ms. Rivera's financing while making the offer for financing. Detroit Tire failed to properly repair the transmission and failed to inform Ms. Rivera of the true costs of her repairs prior to repairing her vehicle.

127. Upon information and belief, Synchrony compensated Detroit Tire for the unauthorized repairs.

128. Upon information and belief, Detroit Tire is an authorized retailer for Synchrony and receives compensation for offering Synchrony's financing program in its shop.

129. As a result of Detroit Tire's deceptive actions, Ms. Rivera suffered damages.

130. As the card issuer, Synchrony is also subject to all claims arising out of Ms. Rivera's vehicle repair, as the card was used as a method of payment or extension of credit. *See* 15 U.S.C. § 1666i.

131. Ms. Rivera seeks an injunction prohibiting Detroit Tire, Detroit #1 Tire, and Synchrony from engaging in such deceptive acts, declaratory judgment that she is not liable for the amount charged to her credit card and actual damages, reasonable attorney's fees and court costs.

132. Because Detroit Tire's deceptive acts were designed to defraud Ms. Rivera through obtaining financing through Synchrony, Ms. Rivera also requests punitive damages.

133. As a mere continuation and alter ego of Defendant Detroit Tire, Defendant Detroit #1 Tire is also liable through corporate successor liability. *See Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 890 N.W.2d at 401 (holding that the mere continuation exception to successor nonliability remains a viable theory of successor liability in Michigan).

**COUNT V – FRAUDULENT MISREPRESENTATION**
**(Defendants Detroit Tire and Detroit #1 Tire)**

134. Ms. Rivera re-alleges and incorporates by reference all preceding paragraphs.

135. Detroit Tire represented that it was only going to repair Ms. Rivera's transmission and that the repair would be approximately $2,000.00.

136. Detroit Tire made such a representation to induce Ms. Rivera into agreeing to allow Detroit Tire to repair her vehicle.

137. At the time that Detroit Tire made the representations, it knew that its representations were false or were reckless and made with the intent that Ms. Rivera would rely on its statements.

138. Ms. Rivera relied on Detroit Tire's statements and allowed it to repair her transmission and charge her credit card with Synchrony in the amount of approximately $2,000.00.

139. Detroit Tire, however, performed additional repairs without Ms. Rivera's authorization and charged her card with Synchrony nearly $9,000.00.

140. Upon information and belief, Detroit Tire also fraudulently authorized additional charges to her card by signing her name without her consent to Synchrony's credit card receipts.

141. Detroit Tire also failed to properly repair her transmission, the only repair she authorized Detroit Tire to make.

142. Detroit Tire's fraudulent behavior has damaged Ms. Rivera. She has incurred nearly $9,000.00 of unauthorized charges, which are accruing interest at a 25% APR. She has had to pay additional mechanics to properly repair her vehicle.

And, most significantly, Ms. Rivera has suffered significant stress, anxiety and emotional damages as a result of Detroit Tire's actions.

143. Accordingly, Detroit Tire is liable for fraud and Ms. Rivera is entitled to damages.

144. As a mere continuation and alter ego of Defendant Detroit Tire, Defendant Detroit #1 Tire is also liable through corporate successor liability. *See Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 890 N.W.2d at 401 (holding that the mere continuation exception to successor nonliability remains a viable theory of successor liability in Michigan).

**RELIEF REQUESTED**

For these reasons, Plaintiff Yvonne Rivera respectfully requests that this Court:

A. Enjoin Detroit Tire and Detroit #1 Tire from engaging in further activity in violation of the Michigan Motor Vehicle Repair and Services Act and the Michigan Credit Services Protection Act;

B. Declare that Ms. Rivera is not responsible for the unauthorized charges and associated interest charged to her Synchrony card;

C. Order Synchrony to remove any unauthorized charges from her bill and to correct any trade line items with all credit bureaus to which it reports;

D. Award Ms. Rivera actual and statutory damages in an amount to be proven at trial;

E. Award Ms. Rivera's reasonable costs and attorneys' fees for the prosecution of this action; and

F. Grant Ms. Rivera such further relief as the Court deems just and proper.

## JURY DEMAND

Ms. Rivera demands a trial by jury on all issues raised herein. Fed. R. Civ. P. 38(b).

Respectfully submitted,

/s/ Carrie L. Floyd
Carrie L. Floyd (P80389)
David Popoola, Law Student
Lakeshore Legal Aid
*Attorney for Plaintiff*
2727 Second Ave., Suite 301
Detroit, MI 48201
P: 313-242-0811, ext. 1316
cfloyd@lakeshorelegalaid.org

Dated: April 5, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using the Court's ECF system, which will send notification of such filing to all counsel of record.

/s/ Carrie Floyd
Carrie Floyd (P80389)
LAKESHORE LEGAL AID